22-04545MB

## <u>AFFIDAVIT IN SUPPORT OF A WARRANT APPLICATION UNDER RULE 41</u>

I, Ryan Stow, being first duly sworn, hereby depose and state as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1) I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices and removable media listed in Attachment A—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2) There is probable cause to believe that a search of the device will lead to evidence of drug smuggling violations under 21 U.S.C. § 841(a) as well as to the identification of individuals who are engaged in the commission of those and related crimes.

3) The facts that establish the probable cause necessary for issuance of the Order are personally known to me, are contained in official government or business records I have reviewed; or have been told to me directly by other members of the investigative team, which includes federal, state, or local law enforcement officers with whom I have worked on this investigation.  As this affidavit is submitted for a limited purpose, it does not contain all aspects of this investigation, but only sufficient information to establish probable cause in support of the issuance of an Order for the examination of the device.

## <u>SUSPECTED VIOLATIONS</u>

- Title 21 U.S.C. § 841 - Possession with Intent to Distribute a Controlled Substances (Fentanyl)

## INTRODUCTION AND AGENT BACKGROUND

4)   I am a Special Agent employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I have been employed as a Special Agent since April 2021. I am assigned to the Assistant Special Agent in Charge (ASAC), Nogales, Arizona office.  I have completed the Criminal Investigator Training Program and the Homeland Security Investigations Special Agent Training located at the Federal Law Enforcement Training Center in Glynco, GA. Prior to becoming a Special Agent, I was employed for approximately five (5) years as a Police Officer with the Louisville Metro Police Department in Louisville, Kentucky. Through my training and experience, I have received instruction and worked on investigations involving controlled substances and other contraband smuggling, operations of drug trafficking organizations (DTOs), contraband concealment and transportation techniques, interdiction operations, surveillance techniques, report writing, confidential source management, and training regarding the interception of wire, oral, and electronic communications, among other areas.

5)   Through my training and experience, including on-the-job discussions with other law enforcement agents and cooperating suspects, I am familiar with the operational techniques and structure of contraband smuggling organizations. My responsibilities include conducting investigations into Drug Trafficking Organizations (DTO) and individuals who derive substantial income from the illicit movement and distribution of narcotics and/or firearms. As a Special Agent with HSI, I am responsible for

investigating and enforcing violations of federal law to include the enforcement of various federal customs and immigration laws.

6)    Through training and experience I know:

a) That contraband smugglers involved in the illicit movement of narcotics/firearms often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates, or business entities, to avoid detection of these assets by governmental agencies;

b) That even though these assets are in names of others than the smugglers, the smugglers actually own and continue to use these assets and exercise dominion and control over them;

c) That contraband smugglers maintain books, records, receipts, notes, ledgers, personal computers, cellular phones, money orders and other papers relating to the movement and storage of narcotics/firearms;

d) That large-scale narcotics/firearms traffickers often utilize electronic equipment such as cellular telephones, personal digital assistants (PDAs), computers, telex machines, facsimile machines and telephone answering machines to generate, transfer, count, record, and/or store the information described in items a, b, and c;

e) That narcotics/firearms smugglers commonly use cellular telephones to communicate with their associates and to facilitate movement and housing of narcotics/firearms. These cellular telephones usually contain electronically stored data on or within the cellular telephones, including, but not limited to, contact names and numbers of associates, call details including call history, electronic mail (email)

3

messages, text messages and/or text message history, and digital images of the narcotics/firearms trafficking associates and/or activity, all of which can be used to identify and locate associates, to identify methods of operation of the traffickers, and to corroborate other evidence obtained during the course of the current investigation; f)That narcotics/firearms traffickers take, or cause to be taken, photographs and videos of themselves, their associates, their property, and their narcotics/firearms. That these smugglers usually maintain these photographs within their possession, in their residences, vehicles, businesses, cellular telephones, or other locations which they maintain dominion and control over.

7)  This affidavit is based on information which is personally known by me or which I learned from other law enforcement agents.  This affidavit is intended to show only that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

8)  The property items to be searched are documented on DHS form 6051S, "Custody Receipt for Seized Property and Evidence," as line item 0003 (Target Phone 1), belonging to event 2022260400046101, and 0002 (Target Phone 2) belonging to event 2022260400046001.

a) Target Phone 1– Nokia – IMEI: 354773223081674

b) Target Phone 2 – Samsung – IMEI: 354261/11/515669/7

9)  Target Phone 1 and Target Phone 2 are further described in Attachment A.

10) The Target cell phones are currently in law enforcement custody and are being held at the HSI Nogales office; 41 Paseo De Yucatan, Rio Rico, AZ 85648.

11) The applied-for warrant would authorize the forensic examination of Target Phone 1 and Target Phone 2 for the purpose of identifying electronically stored data particularly described in Attachment B.

## **PROBABLE CAUSE**

12) On April 22nd, 2022, at approximately 0645 hours, U.S. Customs and Border Protection Officer (CBPO) Martin Adame was assigned to pedestrian crossings at the DeConcini  Port of Entry (POE), in Nogales, AZ. Subject CANEZ, Saul Gerardo applied for admission into the United States. CANEZ stated to CBPO Adame he was coming from Nogales, Mexico from visiting his mother. When CANEZ was queried on law enforcement systems, it showed CANEZ as a subject match for a National Crime Information Center (NCIC) hit for being a gang member. CANEZ was referred to pedestrian secondary for further inspection.

13) On April 22nd, 2022, at approximately 0645 hours, REYES applied for admission, together with CANEZ, into the United States. REYES stated that she was coming from Nogales, Mexico from visiting her boyfriend's (CANEZ) mother. When REYES was queried on law enforcement systems, it revealed REYES had a system alert for human smuggling. REYES was referred to pedestrian secondary for further inspection.

14) On April 22nd, 2022, CBPO Rene Moran was assigned to pedestrian secondary at the DeConcini POE in Nogales, AZ. CANEZ was escorted to pedestrian secondary by

CBPO Adame for an NCIC hit. CBPO Moran reviewed the NCIC hit which stated CANEZ was an active gang member out of Texas. CBPO Moran asked CANEZ what the purpose of his trip to Mexico was. CANEZ stated he and his fiancée, REYES, traveled from El Paso, TX to visit his mother in Nogales, Mexico. CANEZ stated they were in Mexico for only 4 hours. CANEZ stated they were now heading back to El Paso and his vehicle was parked nearby. CANEZ stated his last crossing was in 2021. CANEZ appeared to be in a hurry, and stated he left his dog in his vehicle while he went to Mexico. CBPO Moran noted CANEZ was overly talkative and did not have any luggage, which would match his stated itinerary. CBPO Moran requested approval for a pat down search of CANEZ from Supervisory CBPO (SCBPO) Armendariz. SCBPO Armendariz approved the pat down. CBPO Moran escorted CANEZ to the designated pat down room and began the pat down at approximately 0715 hours, with SCBPO Armendariz acting as his witness. As CBPO Moran searched the groin area, outside of CANEZ's clothing, he felt a bulky object, inconsistent with the human anatomy. As CBPO Moran began to speak to CANEZ, CANEZ became emotional and asked SCBPO Armendariz if he could speak to him CBPO Moran asked CANEZ if he had something in his groin area, to which he stated yes. CANEZ was wearing two pairs of underwear under his jeans. CANEZ voluntarily lowered his jeans. An unnatural bulge was protruding from the underwear from the back of CANEZ's groin area. CANEZ lowered his first pair underwear, and CBPO Moran removed a red condom containing pills. CANEZ began to cry. CBPO Moran completed the pat down at 0720 hours and moved CANEZ to the holding cell as

CBPO Moran gathered the evidence and collected CANEZ's belongings. CBPO Moran took photographs of CANEZ, along with his tattoos. CBPO Moran escorted CANEZ to the holding cell at the supervisor's office. CBPO Moran took the package to the testing area and obtained a weight of 157.2 grams using a calibrated scale. CBPO Moran tested the contents of the package utilizing the Rapid Response narcotics identifier which gave positive results for the properties of fentanyl, with CBPO Fryer acting as his witness. An additional sample of the narcotics was taken on corresponding DHS form 6051S and transported to the Laboratories and Scientific Services Directorate (LSS) forward operating lab for further testing. The package of fentanyl pills was seized on DHS form 6051S and placed in the temporary vault at the DeConcini POE.

15) On April 22nd, 2022, at approximately 0655 hours, REYES was escorted to pedestrian secondary by CBPO Adame for a match to a system alert for human smuggling. REYES was accompanied by her fiancée, CANEZ. REYES stated she traveled to Nogales, Sonora, Mexico, with CANEZ to meet his mother. REYES stated this was her first time in Nogales, Mexico, and stated her last crossing was through Texas. CBPO Moran noted REYES appeared hesitant to answer questions involving her itinerary. REYES remained in the secondary area while CBPO Moran conducted a pat down of CANEZ. After CBPO Moran completed the pat down on CANEZ with positive results, SCBPO Armendariz requested REYES be patted down due to their association and travel together. CBPO Meza and CBPO Montes completed the pat down on REYES and proceeded to conduct a partial body search with SCBPO Gracia

as a witness. The results of the partial body cavity search were positive after a red condom containing pills was visually observed in her vaginal cavity. After the partial body search was complete, SCBPO Gracia observed that REYES became unresponsive. CBPO Moran assisted SCBPO Gracia in placing REYES in a recovery position and opened her mouth for a better airway, as it sounded like REYES was snoring and struggling to breath. Due to the circumstances, CBPO Moran administered a dose of Narcan at approximately 0746 hours while emergency medical services responded. After EMS arrived, CBPO Moran administered a second dose of Narcan at approximately 0750 hours as REYES was still not responding to stimuli. Nogales Fire took over medical care and transported REYES to the hospital. CBPO Meza accompanied REYES. CBPO Moran was not able to obtain more information on REYES due to the medical emergency.

16) At approximately 0733 hours, SA Ryan Stow was notified of the seizure by the CBP Nogales Operations Center. At approximately 9:00, SA Stow, (Supervisory Special Agent) SSA Tony Tran, (Task Force Officer) TFO Orlando Robles and TFO Bret Earls responded to the DeConcini Port of Entry (POE) for the interview of CANEZ and REYES.

17) At approximately 0955 hours, SA Ryan Stow, TFO Robles and TFO Earls began to interview CANEZ.

18) CANEZ stated his fiancée REYES and he drove from El, Paso, Texas to Nogales, AZ so that they can park their vehicle and walk into Nogales, Sonora, Mexico to see CANEZ's mother. CANEZ stated he was apprehensive about going to Nogales,

Mexico because back in 2008-2009, CANEZ worked for a Mexican cartel, and a shipment of drugs and money went missing. Because of this, CANEZ was indebted to the cartel. CANEZ stated he was afraid he would be seen, however he wanted to see his mother. CANEZ stated they crossed into Mexico and went to his mother's house and stayed there for approximately 2 hours. CANEZ stated as they were headed back into the United States, they were apprehended by an individual he knew as, "The attorney." CANEZ stated he owed the cartel money, and to pay off the debt, he and REYES would have to carry narcotics into the United States. CANEZ stated once he had concealed the narcotics, he was to transport them into the US and meet with an individual in Nogales, Arizona. CANEZ stated that once this was completed, his debt would be paid off, and he would have the option to continue to work with the cartel to make money.

19) During the interview of CANEZ, SA Stow observed numerous calls and text messages from an individual named, "Guerro Adan," on target phone 1, which CANEZ identified as his phone. The text messages read, "Can you come to the car wash please that's where I'm at," and, "I can come pick you guys up from the gates so you don't have to walk." Additionally, SA Stow was able to see the contact saved as "Guerro Adan" had messaged CANEZ specific points on a map of his location.

20) At approximately 1220 hours, on the same date, TFO Robles and TFO Earls conducted an interview of REYES. REYES stated CANEZ and her left El Paso, TX and drove to Tucson, Arizona early Friday morning. REYES additionally stated she and CANEZ left Tucson and drove to Nogales, AZ so they could meet CANEZ's

mother at the border fence to get a ring from CANEZ's mother. Once at the border, CANEZ said he wanted to go into Mexico so that he could spend more time with his mother. REYES stated CANEZ's mother picked them up on the Nogales, Mexico side and drove them to CANEZ's mother's house. REYES stated she fell asleep and did not remember most of the trip. REYES stated she did not remember how the package got inside of her, and that the person that dropped CANEZ and REYES off at the border to return to the US was not the same person that picked her up. When TFO Earls and TFO Robles concluded the interview based on the lack of additional information, REYES recanted and stated she wanted to talk. REYES then stated she and CANEZ were picked up by CANEZ's mother in Nogales, Mexico and went to her house for a short period. REYES stated they were then picked up by unknown individuals and taken to another house, where REYES relaxed on the couch while two teenagers played video games in the living room. REYES stated an individual named, "Licenciado" took CANEZ individually into another room and then later, Licenciado took REYES into the same room. REYES stated she was forced to insert a red condom containing pills, wrapped in saran wrap into her vaginal cavity.

21) SA Stow observed a total of three (3) phones that were detained during the incident. One Nokia phone was identified by CANEZ as being his (Target phone 1), one Motorola cell phone that REYES was identified by REYES as hers, and a Nokia cell phone was identified by REYES as a phone both CANEZ and REYES shared (Target phone 2).

## **TECHNICAL TERMS**

22) Based on my training and experience, I use the following technical terms to convey
the following meanings:

a) <u>Wireless telephone</u>:   A wireless telephone (or mobile telephone, or cellular
telephone) is a handheld wireless device used for voice and data communication
through radio signals.   These telephones send signals through networks of
transmitter/receivers, enabling communication with other wireless telephones or
traditional "land line" telephones.   A wireless telephone usually contains a "call log,"
which records the telephone number, date, and time of calls made to and from the
phone.   In addition to enabling voice communications, wireless telephones offer a
broad range of capabilities.   These capabilities include: storing names and phone
numbers in electronic "address books;" sending, receiving, and storing text messages
and e-mail; taking, sending, receiving, and storing still photographs and moving
video; storing and playing back audio files; storing dates, appointments, and other
information on personal calendars; and accessing and downloading information from
the Internet.   Wireless telephones may also include global positioning system ("GPS")
technology for determining the location of the device.

b) <u>Digital camera</u>:  A digital camera is a camera that records pictures as digital picture
files, rather than by using photographic film.   Digital cameras use a variety of fixed
and removable storage media to store their recorded images.   Images can usually be
retrieved by connecting the camera to a computer or by connecting the removable
storage medium to a separate reader.   Removable storage media include various types

of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c) Portable media player:  A portable media player is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d) GPS:  A GPS navigation device uses the Global Positioning System (GPS) to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to

that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e) <u>PDA</u>:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f)<u>Tablet</u>:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g) <u>Pager</u>:   A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h) <u>IP Address</u>: An Internet Protocol (IP) address is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet computer is assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i) <u>Internet</u>: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

23) Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the target devices have capabilities that allows it to serve as a wireless telephone, receive and send email, instant messaging, a digital camera, and serve as a GPS navigation device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

24) Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on electronic devices. This information can sometimes be recovered with forensic tools.

25) *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the target devices were used, the purpose of its use, who used it, and when.   There is probable cause to believe that the following forensic electronic evidence might be found on the target devices:

a) Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b) Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c) A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d) The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e) Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

26) *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Target Phone 1 and Target Phone 2 consistent with the warrant. The examination may require authorities to employ techniques, including, but not limited to, computer-assisted scans of the entire medium, that might expose many parts of the target devices to human inspection in order to determine whether it is evidence described by the warrant.

27) *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## <u>ADVANCED DIGITAL DATA EXTRACTION REQUEST</u>

28) This warrant provides authorization for law enforcement officers of the HSI Nogales office or their designee to search the above-listed device(s) and/or associated peripheral equipment, including by way of example but not limitation, subscriber identity module (SIM) card(s), removable storage media, and/or paired or synced device(s), for the evidence listed in the affidavit and warrant using a range of data analysis techniques. However, in some cases, the cellular communication device(s) may be damaged beyond repair, password-protected or otherwise inoperable and less invasive data analysis techniques will not accomplish the forensic goals of the examination. In these cases, an analysis technique referred to as "chip-off" may be implemented to conduct the data extraction process. Chip-off is an advanced digital data extraction and analysis technique which involves physically removing flash memory chip(s) from a subject device and then acquiring the raw data using specialized equipment. This process renders the cellular communication device unusable.

29) Your Affiant is respectfully requesting authorization to conduct an advanced digital data extraction technique, more commonly known as a "chip-off," of the above-listed device(s) in the event and only after less invasive traditional data analysis techniques fail.

22-04545MB

## **CONCLUSION**

30)  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the target devices as described in Attachment A to seek the items described in Attachment B.

RYAN E STOW   Digitally signed by RYAN E STOW
Date: 2022.05.13 12:28:03 -07'00'

_____

Ryan Stow, Special Agent
Homeland Security Investigations

Subscribed and sworn to telephonically on <u>13th</u> day of May 2022.

_____

Maria S. Aguilera,
UNITED STATES MAGISTRATE JUDGE

18

22-04545MB

ATTACHMENT A

PREMISES TO BE SEARCHED

31)   This warrant applies the following:

32)   The property items to be searched are documented on DHS form 6051S, "Custody Receipt for Seized Property and Evidence," as line item 0003 (Target Phone 1), belonging to event 2022260400046101, and 0002 (Target Phone 2) belonging to event 2022260400046001.

a) Target Phone 1– Nokia – IMEI: 354773223081674

b) Target Phone 2 – Samsung – IMEI: 354261/11/515669/7

(1)   Photos of Target Phone 1 below:



22-04545MB

(2)   Photos of Target Phone 2 below:



22-04545MB

ATTACHMENT B

The particular items to be seized from Target Phone and to be searched are as follows:

1.  All records on the device that relate to violations of:

- Title 21 U.S.C. § 841 (Possession with Intent to Distribute Fentanyl)

    a. Any and all photographs or video depicting other co-conspirator(s);

    b. Any and all SMS/MMS messages, voice messages, instant messages, third-party messaging application data, telephone numbers and notes, appointment books and/or calendars and notes, to-do lists, bookmarks, electronic mail, social media accounts, financial account information, contact lists, address lists, geo-location data, or any other data concealed within the electronic device to be searched that may relate to the suspected violations of federal law listed above;

    c. Any and all records recording the planning, commission, or concealment of the suspected violations of federal law listed above; and

    d. Any and all micro-SD, memory cards or hard drives attached to or inside the electronic devices to be searched which are used as extended memory storage devices.

2.  Evidence of user attribution showing who used or owned the device to be searched at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3.  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been

22-04545MB

created or stored, including any form of computer, smartphone or electronic storage

(such as flash memory or other media that can store data) and in any photographic

form.